**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAVID KATZ and THOMAS WIGHTMAN, Derivatively on Behalf of IROBOT CORPORATION, | Index No:      19-11692 |
| Plaintiffs, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| vs. | |
| MOHAMAD ALI, MICHAEL BELL, RUEY-BIN KAO, ANDREW MILLER, ELISHA FINNEY, MICHELLE V. STACY, COLIN M. ANGLE, and DEBORAH ELLINGER, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and, | |
| IROBOT CORPORATION, | |
| Nominal Defendant. | |

Plaintiffs, by and through their undersigned counsel, derivatively on behalf of Nominal Defendant iRobot Corporation ("iRobot" or the "Company"), submit this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of publicly available information, including filings by iRobot with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought in the right, and for the benefit, of iRobot against certain of its officers and directors seeking to remedy Defendants' breach of fiduciary duties and unjust enrichment that occurred between November 21, 2016 to present (the "Relevant Period") and have caused substantial harm to iRobot.

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

3.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

4.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). iRobot conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly used the means and instrumentalities of interstate commerce, including the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

**A.**   **Plaintiffs**

5.       ***Plaintiff David Katz*** is, and was at relevant times, a shareholder of iRobot.  Plaintiff Katz will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

6.       ***Plaintiff Thomas Wightman*** is, and was at relevant times, a shareholder of iRobot. Plaintiff Wightman will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**B.**   **Nominal Defendant**

7.       Nominal Defendant iRobot a Delaware corporation headquartered at 8 Crosby Drive, Bedford, Massachusetts 01730, is a global consumer robot company with a portfolio of products focused on indoor and outdoor cleaning applications. The Company's common stock trades on the NASDAQ, which is an efficient market, under ticker symbol "IRBT." iRobot currently has over 28 million shares of common stock outstanding, owned by at least hundreds or thousands of investors.

**C.**   **Director Defendants**

8.       ***Defendant Mohamad Ali*** ("Ali") has served as a director of the Company since August 2015.   Defendant Ali is a member of the Nominating and Corporate Governance Committee.

9.       ***Defendant Michael Bell*** ("Bell") has served as a director of the Company since March 2016.  Defendant Bell is the Chairperson of the Compensation and Talent Committee.

10.       ***Defendant Ruey-Bin Kao*** ("Ruey-Bin Kao") was appointed to the iRobot Board of Directors in June 2018.  Defendant Kao is a member of the Audit Committee.

11.       ***Defendant Andrew Miller*** ("Miller") has served as a director since September

2016.  Defendant Miller is the Chairperson of the Audit Committee and a member of the Nominating and Corporate Governance Committee.  Defendant Miller currently serves as the Chief Financial Officer ("CFO") of PTC Inc. ("PTC"), which provides engineering software and cloud services to the Company.  In fiscal year 2018, the Company paid to PTC approximately $407,126.38 in respect of these services.

12.     ***Defendant Elisha Finney*** ("Finney") has served as a director of the Company since January 2017.  Defendant Finney is a member of the Audit Committee and the Compensation and Talent Committee.

13.     ***Defendant Michelle V. Stacy*** ("Stacy") has served as a director of the Company since August 2014.  Defendant Stacey is a member of the Compensation and Talent Committee.

14.     ***Defendant Colin M. Angle*** ("Angle") is a co-founder of iRobot, has served as Chairman of the Board since October 2008, as Chief Executive Officer ("CEO") since June 1997, and prior to that, as the Company's President since November 1992.  He has served as a director of the Company since October 1992.

15.     ***Defendant Deborah Ellinger*** ("Ellinger") has served as a director of the Company since November 2011.  Defendant Ellinger is the Chairperson of the Nominating and Corporate Governance Committee.

**Non-Party**

16.     Non-Party Eva Manolis ("Manolis") has served as a director since July 2019.

17.     Defendants Ali, Bell, Kao, Miller, Finney, Stacy, Angle Ellinger, and non-party Manolis above are herein referred to as the "Director Defendants."

**DUTIES OF DEFENDANTS**

18.     By reason of their positions as officers and/or directors of the Company, and

because of their ability to control the business and corporate affairs of iRobot, Defendants owed its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required Defendants to use their utmost abilities to control and manage iRobot in an honest and lawful manner. Defendants were and are required to act in furtherance of the best interests of iRobot and its investors.

19.     Each director of the Company owes to iRobot and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

20.     To discharge their duties, the officers and directors of iRobot were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of iRobot were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how iRobot conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

21.     Each defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of IRobot, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

## AUDIT COMMITTEE CHARTER

22.     It is the responsibility of the Audit Committee to assist the Board in its oversight of our financial accounting and reporting practices.  The duties of the Audit Committee include: (i) overseeing the accounting and financial reporting processes of the Company and the audits of the Company's financial statements; (ii) taking, or recommending that the Board take, appropriate action to oversee the qualifications, independence and performance of the Company's independent auditors; (iii) preparing the report required by the rules of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement; (iv) overseeing the Company's compliance with legal and regulatory requirements; and (v) oversee the internal audit function of the Company to ensure compliance with accounting, financial reporting, legal or other regulatory requirements.

23.     The Audit Committee shall regularly report to and review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the independent auditors, the performance of the internal audit function and any other matters that the Audit Committee deems appropriate or is requested to review for the benefit of the Board.

24.     The Audit Committee's Charter also states in relevant part:

Audited Financial Statements and Annual Audit

The Audit Committee shall review the overall audit plan (both internal and external) with the independent auditor and the members of management who are responsible for preparing the Company's financial statements, including the Company's Chief Financial Officer and/or principal accounting officer or principal financial officer (the  Chief Financial Officer and such other officer or officers are referred to herein collectively as the "Senior Accounting Executive").

The Audit Committee shall review and discuss with management (including the Company's Senior Accounting Executive) and with the independent auditor the Company's annual audited financial statements, including (1) all critical accounting

7

policies and practices used or to be used by the Company, (2) the Company's disclosures under "Management's Discussion and Analysis of Financial Conditions and Results of Operations" prior to the filing of the Company's Annual Report on Form 10-K, and (3) any significant financial reporting issues that have arisen in connection with the preparation of such audited financial statements, including any significant, non-routine transactions or judgments.

The Audit Committee must review:

(i)      any analyses prepared by management, the internal auditors and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements. The Audit Committee may consider the ramifications of the use of such alternative disclosures and treatments on the financial statements, and the treatment preferred by the independent auditor. The Audit Committee will also consider other material written communications between the registered public accounting firm and management, such as any management letter or schedule of unadjusted differences;

(ii)     major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of any material control deficiencies;

(iii)    major issues regarding accounting principles and procedures and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and

(iv)    the effects of regulatory and accounting initiatives, as well as off-balance sheet transactions and structures, on the financial statements of the Company

The Audit Committee shall review and discuss with the independent auditor (outside of the presence of management) how the independent auditor plans to handle its responsibilities under the Private Securities Litigation Reform Act of 1995, and request assurance from the auditor that Section 10A of the Private Securities Litigation Reform Act of 1995 has not been implicated.

The Audit Committee shall review and discuss with the independent auditor any audit problems or difficulties and management's response thereto. This review shall include (1) any difficulties encountered by the auditor in the course of performing its audit work, including any restrictions on the scope of its activities or its access to information, (2) any significant disagreements with management and (3) a discussion of the responsibilities, budget and staffing of the Company's internal audit function.

The Audit Committee shall discuss with the independent auditors those matters brought to the attention of the Audit Committee by the auditors pursuant to Statement on Auditing Standards No. 61, as amended ("SAS 61").

The Audit Committee shall also review and discuss with the independent auditors the report required to be delivered by such auditors pursuant to Section 10A(k) of the Exchange Act.

As brought to the attention of the Audit Committee, the Audit Committee shall discuss with the Chief Executive Officer and Chief Financial Officer of the Company (1) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, within the time periods specified in the SEC's rules and forms, and (2) any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting.

Based on the Audit Committee's review and discussions (1) with management of the audited financial statements, (2) with the independent auditor of the matters required to be discussed by SAS 61, and (3) with the independent auditor concerning the independent auditor's independence, the Audit Committee shall make a recommendation to the Board as to whether the Company's audited financial statements should be included in the Company's Annual Report on Form 10-K for the last fiscal year.

The Audit Committee shall prepare the Audit Committee report required by Item 407(d) of Regulation S-K of the Exchange Act (or any successor provision) to be included in the Company's annual proxy statement.

## BACKGROUND

25.    iRobot is a global consumer robot company based in Bedford, Massachusetts. Founded in 1990, iRobot designs and builds robots to assist with household tasks and has sold more than 25 million robots worldwide.  iRobot's most popular product line is its autonomous robotic vacuum cleaners, which the Company first introduced with the Roomba Vacuuming Robot in 2002.  iRobot's products, including the Roomba line, purport to feature proprietary technologies and advanced concepts in cleaning, mapping, and navigation.

26.    In November 2016, iRobot announced the first of two upcoming acquisitions, the

acquisition of the iRobot-related distribution business of Tokyo-based Sales on Demand Corporation ("SODC").   The Company said the acquisition would "better enable iRobot to maintain its leadership position and accelerate the growth of its business in Japan through direct control of pre- and post-sales market activities including sales, marketing, branding, channel relationships and customer service."

27.     Following this announcement and throughout the Relevant Period, iRobot reported explosive, double-digit revenue growth and reaffirmed its positive outlook, attributing its strong performance to growing demand for the Roomba line of products, expanded gross margin due to distributor acquisitions, greater brand awareness, and technological innovation.   The truth behind the Company's revenue numbers was that it was engaging in channel-stuffing — the deceptive practice of sending retailers and distributors in a company's distribution channel more products than those retailers would ordinarily purchase from the company or be able to sell to the public during a given period, enabling the Company to book those as sales in the current quarter or year.

28.     Here, iRobot was stuffing the channel through its control of the two distributors it had acquired in order to continue its deceptive scheme.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

29.     On November 21, 2016, when iRobot announced it would be acquiring the iRobot-related distribution business of privately-held SODC, in a press release that day, the Company said the acquisition would "better enable iRobot to maintain its leadership position and accelerate the growth of its business in Japan through direct control of pre- and post sale market activities including sales, marketing, branding, channel relationships and customer service."

30.     iRobot completed the purchase of SODC on April 11, 2017 for $18 million — equal to the book value of the acquired assets.   In a press release issued the day of the acquisition's

10

completion, the Company reiterated the purported rationale for the acquisition: to "better enable iRobot to maintain its leadership position and accelerate the growth of its business in Japan through direct control of pre- and post-sales market activities[.]"

31.     On July 25, 2017, the Company announced that it would be acquiring privately-held Robopolis SAS ("Robopolis"), based in Lyon, France, for $141 million.  Robopolis had been an exclusive distributor of iRobot products since 2006 and the Company's largest distributor in Europe, the Middle East, and Africa (the "EMEA" region).  In the press release announcing the acquisition, iRobot Co-Founder, Chairman, and Chief Executive Officer Colin M. Angle ("Angle") stated: "At this stage in the Western European market evolution, and the growth opportunity it presents, we feel a more direct go-to-market strategy is necessary to continue driving adoption of robots for the home."  The press release also said the Ropobolis acquisition would "further enhance the company's distribution network, ensure global brand consistency and better serve the needs of European consumers while driving continued growth in Western Europe through a consistent approach to all market activities including sales, marketing, branding, channel relationships and customer service."

32.     On October 2, 2017, the Company completed the acquisition of Robopolis.  In a press release issued that day, the Company reaffirmed its purported rationale for the purchase of its largest European distributor, stating:

> "With the acquisition, iRobot will further extend its overseas control of market activities, including consistent global messaging, that will help drive greater adoption of robotic vacuum cleaners and affirm iRobot's segment leadership."

33.     Following the acquisitions, in a February 7, 2018 press release, iRobot reported "record" revenue fourth quarter and full-year revenue: "[W]e delivered fantastic quarterly and full year revenue growth of 54% and 34% respectively, over Q4 and full-year 2016.  Record Q4

11

revenue was driven by very strong sales in the United States, and in EMEA, as the overall category continued to grow at an accelerating rate." The Company also stated that in 2018, it expected to "cross the billion-dollar revenue threshold and deliver $1.05 to $1.08 billion in revenue, which is year-over-year growth of 19% to 22%, operating income of $86 to $96 million and EPS of $2.10 to $2.35."

34.     On June 12, 2018, iRobot Executive Vice President, Chief Financial Officer, Treasurer, and Principal Accounting Officer Alison Dean spoke at the Nasdaq Investor Conference. Dean discussed the Company's recent acquisitions of SODC and Robopolis stating in relevant part:

> [T]here were two situations where we felt by going direct to market, we would be better off and that resulted in the two acquisitions we made last year. . . . And the rationale there was that these distributors have done a great job, getting us established and creating that initial market awareness. . . . [T]he real benefits we think we will get from that, there's certainly a pickup in revenue and margin by taking out the middleman, but it's really this direct control of go-to-market activities that we think will further help us penetrate the market there and drive further adoption of the products in the categories.

35.     That day, an investment analyst upgraded its rating of iRobot stock to "Good" from "Above Average," citing a rise in the Company's business market sentiment and the likelihood that the Company would deliver long-term returns.

36.     On July 25, 2018, iRobot held its second quarter 2018 earnings call. On that call, Defendant Angle reported 15% year-over-year revenue growth in the U.S. and 34% international revenue growth. Defendant Angle noted that "[i]n the U.S., sales were robust . . . as consumers continued to appreciate the value proposition of our products. In EMEA, revenue grew 51%, where we saw strong demand, also benefiting from the revenue uplift associated with sales in the EMEA countries, where we now sell direct."

37.     On that call, Defendant Angle also discussed iRobot's inventory levels, telling

investors that the Company expected DII—an efficiency ratio that measures the average number of days a company holds its inventory before selling it—to increase temporarily due to structural changes in the Company's business and "typical quarterly fluctuations" before declining at year-end.  Defendant Angle stated: "We continue working to identify operating efficiencies to improve working capital and reduce DII over time."  Later on the call, an investment analyst from Piper Jaffray Companies asked Alison Dean to confirm a comment she had made that implied there had been no change in channel inventory, to which Dean replied: "Yeah, I'd say the channel inventory levels are where they normally are.  I don't think they've changed dramatically from where they were at the end of Q1 or last year."

38.     Defendant Angle again spoke about the SODC and Robopolis acquisitions at the Citi Global Technology Conference on September 5, 2018.  A research analyst for Citigroup asked about the strategic importance for iRobot of acquiring the two distributors.  Defendant Angle replied:

> [W]e saw that there are opportunities to improve the performance of these distributors by focusing on how they were going to market, in particular how they were approaching online sales, because these, the two distributors we bought, were very much—had DNA in the brick-and-mortar domain and we felt missing opportunities online. And so that we made these two acquisitions [last year] and have been able to really successfully move them into a more mixed focus between brick and mortar and online, start deploying the marketing programs that have been proven out in North America, and are very excited about those acquisitions driving the growth that we're predicting, continuing well into the future.

39.     Then, on October 24, 2018, iRobot held its third quarter 2018 earnings call.  When asked for a comment about overall growth rates for the Company given the one-year anniversary of the SODC and Robopolis acquisitions, Dean responded: "We're continuing to see good momentum in all the markets regionally, U.S., EMEA, and Japan, and I think that will all be growth contributors as we look forward."

40.     Similarly, on a February 7, 2019 fourth quarter and year-end 2018 earnings call, Defendant Angle reported: "Revenue grew 24%, crossing the $1 billion revenue threshold in an increasingly competitive market and we delivered an operating margin of nearly 10% after absorbing the impact of tariffs in Q4."   Defendant Angle also attributed strong holiday performance to "[s]ubstantial demand for our game-changing Roomba i7 and i7+," and said that "overperformance in Japan was driven by robust Q4 demand supported by our sales and marketing programs in that region."

41.     The statements identified above were materially false and misleading, or omitted material information known to Defendants necessary to make the statements not false and misleading, when made. Specifically, Defendants misrepresented the reason for iRobot's acquisitions of SODC and Robopolis, which was to control the Company's largest distributors so that Defendants could inflate sales and revenue figures by stuffing the channel. Defendants further misled investors by repeatedly telling them throughout the Relevant Period that the Company was seeing continued double-digit revenue growth, and by attributing the growth to increased demand for the Roomba, when in reality Defendants were engaging in channel-stuffing to artificially boost sales. Defendants also misstated that the Company's channel inventory levels had not changed and would not change dramatically from quarter to quarter or year over year, when in fact iRobot was deliberately stuffing the channel in order to claim false revenue growth.

**THE TRUTH EMERGES**

42.     On April 23, 2019, after the close of trading, iRobot surprised the market by announcing quarterly revenues that were below analyst expectations and also revealed surging inventory levels. Specifically, the Company reported DII of 140 for the three months ended March 30, 2019, compared to DII of 101 for the three months ended March 31, 2018. Inventory also rose

14

to $181 million as of March 30, 2019, up from $112 million in April 2018.

43.    In response to this news, iRobot's stock price fell from $130.57 per share on April 23, 2019, to $100.42 per share on April 24, 2019 on unusually high trading volume—a decline of over 23% in one trading day.

44.    On July 23, 2019, after the close of trading, iRobot cut its full-year earnings forecast.  Specifically, fiscal year 2019 revenue guidance was lowered from a range between $1.28 billion and $1.31 billion, to a range between $1.2 billion and $1.25 billion, and earnings per share guidance was lowered from a range between $3.15 and $3.40 to a range between $2.40 and $3.15. In response to this news, iRobot's stock price fell from $89.63 per share on July 23, 2019 to $74.51 per share on July 24, 2019 on unusually high trading volume—a decline of nearly 17% in one trading day.

45.    Then, after the close of trading on October 22, 2019, iRobot issued a press release reporting third quarter 2019 financial results. The Company cut the high end of its revenue expectations for the year, from $1.25 billion to $1.21 billion, and said it rolled back price increases after a "suboptimal" customer response. Tellingly, the Company reported increased inventory levels once again, with third quarter 2019 ending inventory of $248 million or 149 DII compared to the $161 million or 113 DII a year prior.  In response to this news, iRobot's stock price fell from $54.03 per share on October 22, 2019, to $49.06 per share on October 23, 2019 on unusually high trading volume—a decline of over 9% in one trading day.

## THE COMPANY'S STOCK REPURCHASE

46.    On February 27, 2018, the Company's Board approved a stock repurchase program authorizing up to $50.0 million in share repurchases.  This share repurchase program commenced on March 28, 2018 with an expiration date of December 28, 2018.  As of June 30, 2018, the

Company completed the repurchase program and repurchased 798,794 shares of common stock totaling $50.0 million.

## IN REPURCHASING STOCK, THE COMPANY RELIED ON FALSE OR MISLEADING STATEMENTS

47.     In repurchasing common stock, iRobot relied on false or misleading statements, either directly or through the "fraud on the market" doctrine articulated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014), or through the doctrine articulated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

48.     Throughout the Relevant Period, the Company justifiably expected Defendant Angle to disclose material information as required by law and SEC regulations in the Company's periodic filings with the SEC and in statements made to the investing public.  The Company would not have purchased its securities at artificially inflated prices had Defendant Angle disclosed all material information known to him or that was so obvious it should have been known to him, as detailed herein. Thus, reliance by iRobot should be presumed with respect to Defendant Angle omissions of material information as established by the *Affiliated Ute* presumption of reliance.

49.     Additionally, the "fraud on the market" presumption applies to Defendant Angle's misstatements of material facts or failures to disclose material facts.

50.     At all relevant times, the market for the Company stock was efficient market for the following reasons, among others:

(a)     iRobot stock met the requirements for listing, and was listed and actively traded on Nasdaq, a highly efficient and automated market;

(b)     As a regulated issuer, iRobot filed periodic public reports with the SEC and Nasdaq;

(c)     iRobot's common-stock trading value was substantial on a daily basis, exceeding millions of shares per day throughout the Relevant Period;

(d)     iRobot regularly and publicly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)     iRobot was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace; and

(f)     The market price of iRobot's stock reacted rapidly to new information entering the market.

51.     As a result of the foregoing, the market for iRobot stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of iRobot's common stock.  The foregoing facts indicate the existence of an efficient market for trading of iRobot's stock and support application of the fraud-on-the-market doctrine.

52.     iRobot relied on the integrity of the market price for the repurchase of its common stock and is entitled to a presumption of reliance with respect to the Defendant Angle's misstatements and omissions alleged herein.

53.     Had iRobot known of the material adverse information not disclosed by Defendant Angle or been aware of the truth behind Defendant Angle's material misstatements, the Company

would not have purchased iRobot stock at artificially inflated prices.

## NEITHER THE STATUTORY "SAFE HARBOR" NOR THE "BESPEAKS CAUTION" DOCTRINE APPLIES TO DEFENDANT ANGLE'S MISREPRESENTATIONS

54.     Neither the safe-harbor provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA") nor the judicially created "bespeaks caution" doctrine applicable to forward looking statements under certain circumstances applies to any of the false or misleading statements pleaded herein.  None of the subject statements constituted a forward-looking statement; rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about the Company seeing continued double-digit revenue growth, and attributing that growth to increased demand for the Roomba, when in reality Defendants were engaging in channel-stuffing to artificially boost sales.  As a result, the statements about iRobot's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

55.     Alternatively, to the extent any of the false or misleading statements pleaded herein could be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important fact that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Further, to the extent the PSLRA's safe harbor would otherwise apply to any forward-looking statements pleaded herein, Defendant Angle is liable for those false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading, or the statement was authorized and/or approved by an executive officer of iRobot who knew that the statement was materially false or misleading when made.  None of the historic or present tense statements made by Defendant Angle were assumptions underlying or relating to any plan,

projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendant Angle expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## LOSS CAUSATION/ECONOMIC LOSS

56.     As a result of the Company's purchases of iRobot common stock during the Relevant Period, the Company suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused the Company's common stock to trade at artificially inflated levels throughout the Relevant Period.

57.     Throughout the Relevant Period, the Company reported explosive, double-digit revenue growth, which it attributed to increasing demand for its Roomba products, expanded gross margin due to distributor acquisitions, greater brand awareness, and technological innovation.  But in reality, iRobot was engaging in channel-stuffing in order to inflate its sales and revenues figures and had acquired two of its largest distributors in order to facilitate and conceal this deceptive practice.

58.     On April 23, 2019, after the close of trading, iRobot surprised the market by announcing quarterly revenues that were below analyst expectations and also revealed surging inventory levels. In response to this news, iRobot's stock price fell from $130.57 per share on April 23, 2019, to $100.42 per share on April 24, 2019 on unusually high trading volume, a decline of over 23% in one trading day.

59.     Then, on July 23, 2019, after the close of trading, iRobot cut its full-year earnings forecast. In response to this news, iRobot's stock price fell from $89.63 per share on July 23, 2019, to $74.51 per share on July 24, 2019 on unusually high trading volume, a decline of nearly 17% in

one trading day.

60.     Finally, on October 22, 2019, after the close of trading, iRobot cut the high end of its revenue expectations for the year, from $1.25 billion to $1.21 billion, and said it rolled back price increases after a "suboptimal" customer response. The Company reported increased inventory levels once again, with third quarter 2019 ending inventory of $248 million or 149 days in inventory ("DII") compared to the $161 million or 113 DII a year prior.  In response to this news, iRobot's stock price fell from $54.03 per share on October 22, 2019, to $49.06 per share on October 23, 2019 on unusually high trading volume, a decline of over 9% in one trading day.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

61.     Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and unjust enrichment by Defendants.

62.     Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and have retained counsel competent and experienced in derivative litigation.

63.     Plaintiffs are current owners of iRobot stock and have continuously been an owner of iRobot stock during times relevant to Defendants' illegal and wrongful course of conduct alleged herein.  Plaintiffs understand their obligation to hold stock throughout the duration of this action and are prepared to do so.

64.     During wrongful course of conduct at the Company, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

65.     The iRobot Board is currently comprised of Defendants Ali, Bell, Kao, Miller, Finney, Stacy, Angle, Ellinger and non-party Manolis.  Thus, Plaintiffs are required to show that a majority of the Demand Defendants, *i.e.*, five, cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

66.     Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning its future prospects. Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

67.     Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

68.     Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiffs have not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

69.     Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

70.     Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or

permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

71.     Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendants are unable to comply with their fiduciary duties and prosecute this action.

72.     Additionally, each of the Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant Angle**

73.     Defendant Angle is not disinterested or independent, and therefore, is incapable of considering demand because Defendant Angle (as CEO of the Company) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent.  As such, Defendant Angle cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

74.     This lack of independence and financial benefits received by Defendant Angle renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

75.     In addition, Defendant Angle is a defendant in the securities class action entitled *Campbell v. iRobot Corp., et al.*, Case 1:19-cv-10373 (S.D.N.Y.) and *Miramar Firefighters' Pension Fund v. iRobot Corp., et al.*, Case 1:19-cv-09837 (S.D.N.Y.) ("Securities Class Actions").

76.     As such, Defendant Angle cannot independently consider any demand to sue

himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

**Defendant Miller**

77.     ***Defendant Andrew Miller*** ("Miller") has served as a director since September 2016.  Defendant Miller is the Chairperson of the Audit Committee and a member of the Nominating and Corporate Governance Committee.  Defendant Miller currently serves as the Chief Financial Officer ("CFO") of PTC Inc. ("PTC"), which provides engineering software and cloud services to the Company.  In fiscal year 2018, the Company paid to PTC approximately $407,126.38 in respect of these services.

78.     Defendant Miller is not disinterested or independent, and therefore, is incapable of considering demand because Defendant PTC, which Defendant Miller is an executive officer, derives substantially revenue from iRobot.  As such, Defendant Miller cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten the revenue that PTC would receive.

79.     This lack of independence and financial benefits received by Defendant Miller renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

**Defendants Miller, Kao and Finney**

80.     During the Relevant Period, Defendants Miller, Kao and Finney served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth

herein.

81.     Defendants Miller, Kao and Finney breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting and business reporting issues and deficiencies described above.  Therefore, Defendants Miller, Kao and Finney face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**All Board Members (other than Non-Party Manolis)**

82.     The Company's Code of Business Conduct and Ethics states in relevant part:

The Company's Board of Directors, in conjunction with the Nominating & Corporate Governance Committee of the Board is responsible for administering the Code. Moreover, the Board of Directors has delegated day-to-day responsibility for administering and interpreting the Code to a Compliance Officer. Our Chief Legal Officer has been appointed the Company's Compliance Officer under this Code.

The Company expects its directors, employees and contractors to exercise reasonable judgment when conducting the Company's business. The Company encourages its directors, employees and contractors to refer to this Code frequently to ensure that they are acting within both the letter and the spirit of this Code. The Company also understands that this Code will not contain the answer to every situation you may encounter or every concern you may have about conducting the Company's business ethically and legally. In these situations, or if you otherwise have questions or concerns about this Code, the Company encourages each employee to speak with his or her manager, or, if you are uncomfortable doing that, with the Compliance Officer under this Code.

\*     \*     \*

**Accuracy of Records**

The integrity, reliability and accuracy in all material respects of the Company's books, records and financial statements are fundamental to iRobot's continued and future business success.

Transactions between the Company and outside individuals and organizations

24

should be promptly and accurately entered in the Company's books in accordance with generally accepted accounting practices and principles, including accurate recording of all labor and material costs (including contract work, internal research and development, and bid and proposal work). No director, employee or contractor may cause the Company to enter into a transaction with the intent to document or record it in a deceptive or unlawful manner.  In addition, no director, employee or contractor may create any false or artificial documentation or book entry for any transaction entered into by the Company. Similarly, officers and employees who have responsibility for accounting and financial reporting matters have a responsibility to accurately record all funds, assets and transactions on the Company's books and records.

83.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the channel stuffing and to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of securities laws, breaches of fiduciary duty, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with the law.  Thus, the Director Defendants face a substantial likelihood of liability and are not independent or disinterested.

## DAMAGE TO THE COMPANY

84.    Defendants' faithless acts and omissions, breaches of fiduciary duty and violations of the federal securities laws and state law have severely damaged, and will continue to damage, iRobot.  By engaging in the aforementioned unlawful scheme, Defendants: (i) caused iRobot to issue materially false and misleading statements to its shareholders and the investment community; (ii) caused iRobot common stock to trade at artificially inflated prices, exposing the Company to millions of dollars in potential civil, regulatory and criminal liability to investors and regulators, including the SEC; and (iii) exposed iRobot to tens of millions of dollars in legal and accounting fees to investigate this misconduct and to defend the Company in expensive to defend regulatory investigations and shareholder litigation.

85.     Moreover, these actions, have irreparably damaged the Company's goodwill and reputation.  For at least the foreseeable future, the Company will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that the Company's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## FIRST CAUSE OF ACTION

### (Against Defendants for Breach of Fiduciary Duties)

86.     Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

87.     Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

88.     Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

89.     Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.

90.     Defendants had actual knowledge of the above misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

91.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

92.     As a direct and proximate result of Defendants' breach of their fiduciary duties, the

Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### (Against Defendants for Unjust Enrichment
### Against Defendants)

93.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

94.     As a result of the conduct described above, Defendants have been unjustly enriched at the expense of the Company.

95.     Defendants received millions of dollars in cash bonuses and equity incentive compensation by causing iRobot to issue materially false and misleading statements to the investment community that exposed it to millions of dollars in potential liability to investors and regulators.  Defendants should be required to disgorge the gains which he obtained and/or will otherwise unjustly obtain at the expense of the Company.  A constructive trust for the benefit of the Company should be imposed thereon.

96.     All the stock sales proceeds and cash bonus and equity compensation payments provided to Defendants were at the expense of the Company.  The Company received no benefit from these stock sales proceeds and payments.  The Company was damaged by such stock sales proceeds and payments.

97.     Plaintiffs, as shareholders and representatives of the Company, seek restitution from Defendants, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, as a result of his wrongful conduct and fiduciary breaches.

## THIRD CAUSE OF ACTION

### (Against the Director Defendants for Violations of
### Section 10(b) of the Exchange Act and SEC Rule 10b-5)

19.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

20.     During the Relevant Period, the Director Defendants disseminated or approved public statements and failed to make the statements not false and misleading, when made. Specifically, Defendants misrepresented the reason for iRobot's acquisitions of SODC and Robopolis, which was to control the Company's largest distributors so that Defendants could inflate sales and revenue figures by stuffing the channel.  Defendants further misled investors by repeatedly telling them throughout the Relevant Period that the Company was seeing continued double-digit revenue growth, and by attributing the growth to increased demand for the Roomba, when in reality Defendants were engaging in channel-stuffing to artificially boost.  Thus, the price of the Company's shares was artificially inflated due to the deception of the Director Defendants. Despite this artificial inflation in the price of the Company's shares, the Director Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing financial harm to the Company.

21.     As alleged herein, the Director Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Director Defendants, by virtue of their receipt of information reflecting the true facts regarding iRobot, their control over, and/or

receipt and/or modification of iRobot's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning iRobot, participated in the fraudulent scheme alleged herein.

22.     Director Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Relevant Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Director Defendants.

23.     The Director Defendants were each members of iRobot's Board of Directors during the aforesaid time period.  Based on their roles at iRobot, each of the Director Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

24.     At a minimum, the Director Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems at iRobot, the Director Defendants knew and/or recklessly disregarded the extent and scope of their statements during the Relevant Period.

25.     Likewise, the Director Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.  The Director Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded,

that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

26.     The allegations above also establish a strong inference that iRobot, as an entity, acted with corporate scienter throughout the Relevant Period because its officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing iRobot's true operating condition and present and expected financial performance from investors. By concealing these material facts from investors, iRobot maintained and/or increased its artificially inflated common stock price throughout the Relevant Period.

27.     As such Director Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud; and

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

28.     As a result of the Director Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

## FOURTH CAUSE OF ACTION

### (Derivative Claim for Violations of Section 20(a)
### of the Exchange Act Against Defendant Angle)

29.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

30.     This Count is asserted on behalf of the Company against Defendant Angle for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

31.     During his tenure as an executive officer and/or Chairman of the Board, Defendant Angle was a controlling person of all officers of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of his control, Defendant Angle had the power and authority to direct the management and activities of the other Company officers, to hire and fire the other Company officers at whim, and to cause the other Company officers to engage in the wrongful conduct complained of herein.  Defendant Angle was able to and did control, directly or indirectly, the content of the public statements made by all other Company officers during the Relevant Period, including the materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

32.     In his capacity as the senior executive, and Chairman of the Board of iRobot, Defendant Angle had direct involvement in and oversight over the day-to-day operations of the Company officers and the Company's employees, who would not act unless Defendant Angle agreed with his course of conduct.

33.     As a result of the foregoing, Defendant Angle, individually, was a controlling person of the other Company officers within the meaning of Section 20(a) of the Exchange Act.

34.     As a direct and proximate result of Defendant Angle's conduct, the Company suffered damages in connection with its purchase of iRobot common stock at materially inflated prices.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.     Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.     Awarding, against all Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: December 20, 2019

GAINEY McKENNA & EGLESTON

By: */s/ Gregory M. Egleston*
    Gregory M. Egleston
Thomas J. McKenna
501 Fifth Avenue
New York, NY  10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: gegleston@gme-law.com
Email: tjmckenna@gme-law.com

*Attorneys for Plaintiffs*

## **VERIFICATION**

I, DAVID KATZ, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of iRobot Corporation and authorize its filing.  I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true.  I further declare that I am a current holder, and have been a holder, of iRobot Corporation common stock at all relevant times.


_____
David Katz

## **VERIFICATION**

THOMAS

I, TY WIGHTMAN, declare that I have reviewed the Verified Shareholder Derivative

Complaint ("Complaint") prepared on behalf of iRobot Corporation and authorize its filing. I have

reviewed the allegations made in the Complaint, and to those allegations of which I have personal

knowledge, I believe those allegations to be true. As to those allegations of which I do not have

personal knowledge, I rely on my counsel and their investigation and for that reason believe them

to be true. I further declare that I am a current holder, and have been a holder, of iRobot

Corporation common stock at all relevant times.

Ty Wightman
THOMAS